IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEANETTE RAHRIG, | ) | CASE NO. 1:12-cv-01162 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jeanette Rahrig ("Plaintiff" or "Rahrig") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 12. For the reasons stated below, the Commissioner's decision is

**AFFIRMED**.

## I.  Procedural History

Rahrig filed her applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") on February 13, 2007.  Tr. 94-98, 99-101.  Rahrig alleged a disability

onset date of September 2, 2006 (Tr. 94, 99, 109, 113), and claimed disability based on back

pain, hip pain, diabetes, depression, heart issues, leg numbness, and sleep apnea (Tr. 68-71, 72,

75, 83, 86).  After initial denial by the state agency (Tr. 72-77), and denial upon reconsideration

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R.
CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

(Tr. 83-88), Rahrig requested a hearing (Tr. 89-90).  On January 12, 2010, Administrative Law Judge Traci M. Hixson ("ALJ") conducted an administrative hearing.  Tr. 32-67.

In her May 12, 2010, decision (Tr. 13-31), the ALJ determined that Rahrig had not been under a disability between September 2, 2006, and the date of the decision.  Tr. 25.  Rahrig requested review of the ALJ's decision by the Appeals Council.  Tr. 12.  On March 23, 2012, the Appeals Council denied Rahrig's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal and Vocational Evidence

Rahrig was born on August 15, 1964.  Tr. 35.  She has two adult children, ages 18 and 26 at the time of the hearing.  Tr. 35.  She resides with her daughter and lives in a single-family home with one floor.  Tr. 35, 39.  She has two grandchildren, 2 years old and 7 months old at the time of the hearing.  Tr. 35-36.  She completed high school.  Tr. 36.  She last worked in 2006 at Servepro doing fire and water restoration work.[2]  Tr. 41.  She also had a variety of other jobs, including parts assembler, cashier, bagger, stocker, dishwasher, and fast food shift manager.   Tr. 41-45

### B.    Medical Evidence[3]

#### 1.    Treatment records

##### a.  Back pain treatment

---

[2] She worked at Servepro for about five years but was fired because her employer believed that she used the company credit card to put gas in her personal car.  Tr. 41-43.  Per Rahrig, her car was in the shop at the time Servepro said she used the company credit card for personal use.  Tr. 42-43.

[3] Plaintiff does not challenge the Commissioner's decision relative to her alleged mental impairments.  Accordingly, the medical evidence discussed herein is generally limited to Plaintiff's physical impairments.

In 2003, diagnostic tests showed narrowing of disc space with mild endplate sclerosis, and moderate anterior lipping between L5-S1 and degenerative joint disease.[4]  Tr. 259-262.  On June 7, 2004, Rahrig underwent a lumbar MRI which showed L2/L3 left annular fissure with disc protrusion impinging on the left foramen, mild multi-level facet joint disease, and degenerative L5/S1 disc disease with mild to moderate left foraminal stenosis.  Tr. 248.

On April 6, 2006, Rahrig saw Dr. Bak, her primary care physician for complaints of lower back pain radiating down her left side.  Tr. 316.  Her strength and gait were normal.  Tr. 316.  On June 23, 2006, Rahrig saw Dr. Bak again with complaints of pain.  Tr. 318.  Rahrig was able to perform heel-toe walk, her gait was normal, and her strength was normal.  Tr. 318.  Dr. Bak assessed low back pain, probably lumbar sprain, and prescribed medication. Tr. 318.

On April 3, 2007, Rahrig saw Dr. Bak with concerns about her depressed mood and complaints of back pain.  Tr. 382-84.  With respect to her back pain, Dr. Bak advised that Rahrig should start exercising in a swimming pool.  Tr. 382.

On January 21, 2008, Rahrig saw Dr. Bak with complaints of back pain on her left side, radiating into her leg and toes with frequent numbness in her lower leg.  Tr. 557, 559.  She reported that her pain had been present during the prior four or five years with on and off exacerbation.  Tr. 557.  She described the pain as debilitating and that she was having difficulty performing household chores and picking up her grandson.  Tr. 557.  A physical examination revealed tenderness to palpation; limited range of motion in the lumbar spine; normal motor function; and, except for an area of decreased sensation in the left buttock, normal sensation.  Tr. 558.  Rahrig could perform heel walk but had difficulty performing toe walk on the left.  Tr. 558.

---

[4] Rahrig's medical records indicate that she began having problems with her lumbar spine following a car accident in 2003.  Tr. 634.

Dr. Back assessed Rahrig with low back pain with features of L5-S1 radiculopathy.[5]  Tr. 558.

Dr. Bak recommended medication, including a muscle relaxer and pain reliever.  Tr. 558.  He

advised Rahrig to continue activity as tolerated but advised against heavy lifting.  Tr. 558.  He

recommended an MRI of the lumbar spine to evaluate for lateral recess stenosis.  Tr. 558.  On

January 30, 2008, Rahrig underwent the recommended MRI, which revealed L5-S1 disc

herniation resulting in minimal left sided neuroforaminal stenosis.  Tr. 576.

On March 12, 2008, at Dr. Bak's request, Domingo Gonzalez, M.D., examined Rahrig.

Tr. 634-35.  His examination of Rahrig's spine revealed no spinal deviation.  Tr. 635.  Dr.

Gonzalez further indicated that: "Motion of spine for flexion, and hyperextension reproduced the

pain after a few degrees, involving the left buttocks area.  Straight leg raising is negative on the

right side, and it is positive on the left side at about 20 degrees with pain shooting down into the

left lower extremity.  Flexion, abduction and rotation of both hips reproduced pain in the lumbar

region, especially on the left side."  Tr. 635.  Rahrig was able to walk on her toes and heels.  Tr.

635.  However, Dr. Gonzalez noted some weakness when Rahrig walked on her heels with her

left leg.  Tr. 635.  There was no evidence of atrophy.  Tr. 635.  Dr. Gonzalez noted that "there

appears to be weakness of the dorsiflexion of the left foot, and also of the big toe on that side,

which is minimal."  Tr. 635.  Rahrig's coordination was normal and her deep tendon reflexes

were symmetrical and equal with normal plantar responses.  Tr. 635.  Dr. Gonzalez concluded

that Rahrig had lumbar radiculopathy from a herniated disk at L5, left; obesity; diabetes and

coronary artery disease.  Tr. 635.  Since prior pain management treatment had not helped Rahrig

very much and because Rahrig wanted a more definitive solution to her chronic problem, Dr.

Gonzalez noted that Rahrig would be referred for a surgical consult.  Tr. 635.

---

[5] Dr. Bak noted that Rahrig's diabetes was controlled with her current medication, her coronary artery disease was stable, and her depression was stable with medication.  Tr. 558.

On March 20, 2008, Rahrig saw Gale A. Hazen, M.D., for a surgical consult.  Tr. 633.
Dr. Hazen concluded that Rahrig was a candidate for left L5-S1 microdiskectomy and Rahrig
agreed to proceed with the surgery.  Tr. 633.  Dr. Hazen performed the L5-S1 surgery on April
16, 2008.  Tr. 636-37, 648-51.  Rahrig tolerated the procedure well and was discharged the next
day.  Tr. 637, 650.  During her post-operative follow-up visit on May 20, 2008, Rahrig was
doing a little better than before the surgery but her left leg was still buckling and she was still
having pain in her left buttock radiating down to about her knee.  Tr. 632.  She was able to get up
and move about more independently than she was able to before the surgery but reported
continuing to have trouble getting around.  Tr. 632.  Before the surgery she reported no good
days, but following surgery she had some good days.  Tr. 632.  Dr. Hazen advised Rahrig that
she still needed time to heal and instructed Rahrig to follow up in four to six weeks.  Tr. 632.

During her June 24, 2008, visit with Dr. Hazen, Rahrig reported doing miserably, with
severe pain down to her left hip and lower extremity.  Tr. 630.  Her left hip buckled which
caused her to fall and suffer a hairline fracture in her right ankle.  Tr. 630.  She reported being
unable to stand up long enough to perform household chores.  Tr. 630.  Dr. Hazen ordered
diagnostic tests because it was difficult to assess the source of the pain.  Tr. 630.  On July 12,
2008, and on July 16, 2008, diagnostic tests were performed, including a lumbar spine MRI and
left hip MRI.  Tr. 638-42.  Based on those tests, which showed L5-S1 foraminal stenosis with L5
neural compression, scarring around the S1 nerve root, and osteoarthritis of the left hip, Dr.
Hazen concluded, on July 22, 2008, that Rahrig was a candidate for left L5-S1 decompression
fusion.  Tr. 628-29.  Following Dr. Hazen's discussion with Rahrig regarding the procedure and
risks associated therewith, Rahrig agreed to proceed with the procedure.  Tr. 629.

On August 6, 2008, Dr. Hazen performed a L5-S1 translumbar microdissection, disectomy, lysis of scar, interbody allografts, autologous bone fusion, pedicle screws, x-ray, bone marrow aspiration.  Tr. 661-62.  Rahrig tolerated the procedure well.  Tr. 662.  One month later, Rahrig saw Dr. Hazen for a post-operative visit.  Tr. 673.  Dr. Hazen stated that Rahrig's August 25, 2008, x-rays looked good with alignment and hardware in place.  Tr. 673.  Rahrig indicated that she had had only minimal improvement with her left lower extremity being about the same, and maybe a little worse.  Tr. 673.  Dr. Hazen prescribed pain medication and instructed Rahrig to continue taking short walks and getting along without a brace six weeks post-operatively.  Tr. 673.

A year later, in September and October of 2009,[6] Rahrig saw physicians at the Northeast Ohio Center for Pain Management.  Tr. 722-27.  She reported pain radiating from her back into her lower left extremities and left leg weakness.  Tr. 722, 727.  Rahrig reported being able to perform most of her activities of daily living o.k. with some assistance.  Tr. 724.  A physical examination on September 17, 2009, revealed some abnormal results, including reduced range of motion and tenderness to palpation.  Tr. 725.  The physician assessed Rahrig as having "unspecified backache" and gait abnormality and raised a question regarding fibromyalgia.[7]  Tr. 726.  On December 19, 2009, Rahrig reported that her low back pain continued to radiate down into her leg.  Tr. 842.  Rahrig's physician noted some treatment options to consider, including acupuncture, physical therapy, and chiropractic care and noted that Rahrig should follow up.  Tr. 843.

---

[6] In a July 23, 2009, letter from Rahrig's counsel to the ALJ, Rahrig's counsel stated that Rahrig had been unable to afford medical treatment for her back since September 2008.  Tr. 182.  Defendant asserts that the records do not support Rahrig's contention.  Doc. 15, p. 15, n. 5.

[7] The physician also assessed Rahrig with "LLRP."  Tr. 726.  Although Rahrig's physician does not specifically state what "LLRP" means, since Rahrig's records reflect complaints of pain radiating into her left leg (e.g., Tr. 722, 727), "LLRP" may refer to left leg radiating pain.

**b.  Diabetes treatment**

In 2005 or early 2006, Rahrig was diagnosed with diabetes.  Tr. 454, 692.  On October 6, 2006, Rahrig saw Anant Jeet, M.D., for uncontrolled diabetes.  Tr. 454-55.  Rahrig reported that she had been receiving samples of diabetic medication from her primary care physician, Dr. Bak, but had not recently received samples.  Tr. 454-56.  Therefore, she had not taken her diabetes medication for about two to three months at the time of her visit with Dr. Jeet and she had not had recent lab work.  Tr. 456.  Rahrig reported that she had seen a dietician and understood how to adhere to a diabetic diet and she was continuing to check her sugar two to three times each day.  Tr. 454.  Rahrig reported that her sugar levels ranged from upper 100s to the 300 range and she also reported numbness and tingling in her right foot.  Tr. 454.  Dr. Jeet assessed Rahrig with uncontrolled diabetes, diabetic peripheral neuropathy, hypercholesterolemia, and coronary artery disease.  Tr. 455.  Dr. Jeet prescribed medication, ordered labs, referred Rahrig to a podiatrist, and advised Rahrig to follow up in four weeks.  Tr. 455.

On January 21, 2008, Dr. Jeet noted that Rahrig had not been seen since March of 2007.  Tr. 488.  Her diabetes was in good control. Tr. 488.

On January 7, 2009, Rahrig saw James Myers, M.D., an endocrinologist, with reports of uncontrolled diabetes.  Tr. 692-93.  Rahrig indicated that she had been under stress because of her two lumbar surgeries.  Tr. 692.  She reported a strong family history of diabetes as well as coronary artery disease.  Tr. 692.  Dr. Myers concluded that Rahrig had uncontrolled type II diabetes and was insulin resistant.  Tr. 693.  He adjusted her medication, ordered labs, and recommended that Rahrig meet with a diabetic educator regarding carbohydrate counting.  Tr. 693.  Dr. Myers also noted that, at some point, he would provide Rahrig with information about an insulin pump.  Tr. 693.

During a November 25, 2009, visit with Vikram Kumar. M.D., F.A.C.E., Rahrig's diabetes was uncontrolled.  Tr. 821.  Dr. Kumar advised Rahrig to follow up in two or three weeks.  Tr. 821.  At a follow-up visit, on December 19, 2009, Rahrig indicated that she felt her blood sugar was under control.  Tr. 762.  However, she reported that she was having difficulties with her vision.  Tr. 762.  Dr. Kumar noted that Rahrig's weight was down and her conditions were under control and she was stable.[8]  Tr. 762.  He advised that Rahrig should follow up in three months.  Tr. 762.

### c.  Heart treatment

Following complaints of chest pain, numbness and tingling in her face and in her left arm, palpitations, and increased shortness of breath, on August 28, 2006, Rahrig underwent a left heart cardiac catheterization, performed by Charles O'Shaughnessy, M.D., a cardiologist.[9]  Tr. 268-72, 294-95, 296-97.  As a result of the catheterization, Dr. O'Shaughnessy concluded that Rahrig's ejection fraction was estimated at 50-55%; her right coronary artery was normal; her left main coronary artery was normal; her proximal left anterior descending coronary artery had 10% stenosis; her distal left anterior descending coronary artery had 25% stenosis; and her circumflex coronary artery was normal.  Tr. 271.  Dr. O'Shaughnessy recommended medical management of her condition.  Tr. 271.

On September 20, 2006, Rahrig underwent 24-hour ambulatory ECG monitoring for evaluation of palpitations.  Tr. 289.  Following the ECG monitoring, it was recommended that Rahrig continue her current medication and follow up with Dr. O'Shaughnessy in January, as scheduled.  Tr. 290-91.

---

[8] Dr. Kumar also noted that Rahrig would be having her vision checked.  Tr. 762.

[9] Rahrig's records show coronary artery disease diagnoses back to at least 2005.  Tr. 298-99, 300-02, 306.

On December 8, 2006, Rahrig underwent further diagnostic testing because of complaints of occasional chest discomfort.  Tr. 284.   That testing showed 50-69% right internal carotid artery stenosis; less than 50% left internal carotid artery stenosis; and antegrade flow within both vertebral and external carotid arteries.  Tr. 284, 287.  Thereafter, in January 2007, Dr. O'Shaughnessy assessed Rahrig with carotid artery stenosis and recommended that she continue with her current medications and follow up with him in one year.  Tr. 284-86.

On January 7, 2008, per Dr. O'Shaughnessy's order, Rahrig underwent further diagnostic testing.  Tr. 568.   The interpreting physician, Dr. John W. Schaeffer, compared the results of Rahrig's January 7, 2008, test with the results from the December 2006 test.  Tr. 568.  He concluded that the 2006 test found higher velocities, which suggested possible moderate disease, whereas the January 7, 2008, test did not show definite acceleration of flow velocities and progression of Rahrig's disease was not indicated.  Tr. 568.   Rahrig saw Dr. O'Shaughnessy for follow-up a month later on February 20, 2008.  Tr. 525.  She reported being under a lot of stress; her son and daughter-in-law were getting a divorce and she was "losing" a grandchild whom she had been caring for on a daily basis.  Tr. 525.  Dr. O'Shaughnessy recommended that Rahrig continue her current medication and stop smoking.  Tr. 525.  Also, because of Rahrig's chest pains, Dr. O'Shaughnessy ordered another catheterization (Tr. 525), which he performed on February 25, 2008 (Tr. 520-23).  Following, the catheterization, Dr. O'Shaughnessy concluded that Rahrig's ejection fraction was 60%; her left main coronary artery vessel was normal; her left anterior descending coronary artery had 20% stenosis; her circumflex coronary artery vessel was normal; and her right coronary artery vessel was normal.  Tr. 520.

On April 9, 2008, Rahrig was seen by Dr. O'Shaughnessy for cardiac evaluation prior to proceeding with lumbar surgery.  Tr. 517.  Dr. O'Shaughnessy indicated that Rahrig's cardiac

status was stable and cleared her for the upcoming surgery, subject to routine pre-op lab results. Tr. 517.

On February 1, 2009, Rahrig was admitted to EMH Regional Medical Center for complaints of left shoulder pain, back pain, and chest pain.  Tr. 676-86.  A CT scan of Rahrig's chest was performed which was negative with no evidence of acute pulmonary embolism.  Tr. 676, 683.  Rahrig's cardiac enzymes and her chest x-ray were also negative.  Tr. 676.

On February 24, 2010, Rahrig met with Dr. O'Shaughnessy to review the results of a February 18, 2010, carotid sonogram.  Tr. 738-40.  As compared to tests from 2009, Dr. O'Shaughnessy indicated that it did not appear that her coronary disease was progressing.  Tr. 738.  He concluded that Rahrig had mild carotid stenosis and her cardiac status remained unchanged.  Tr. 739.

### 2.    State agency consultative physician

On February 16, 2008, Dariush Saghafi, M.D., conducted a consultative examination.  Tr. 405-12.  Rahrig's chief complaint was back pain, which had been occurring for about four to five years, with numbness in her leg for about one year.  Tr. 505.  She reported that her back pain had gotten worse over time and nothing made her pain better.  Tr. 505.  She indicated that, because of her pain, it was more difficult for her to do the dishes, cook, shower, and walk; she could not do any chores alone.  Tr. 505.  Rahrig reported that she could not stand for more than 5 minutes due to pain and numbness; could not bend; and sitting aggravated her pain.  Tr. 505.  Over the prior 2-3 years, Rahrig had gained 60 pounds.  Tr. 505.  Dr. Saghafi indicated that multiple diagnostic tests had been performed for complaints regarding her pelvis, abdomen, heart and neck vessels but the results were normal with the exception of some atherosclerotic narrowing of the right internal carotid being rated as 50-69%.  Tr. 507-08.  Dr. Saghafi's impression was:

The patient suffers from morbid obesity and this is accentuated by the fact she has had a 35% increase in body weight over the past 2-3 years.  This is a significant contributor to her issues of back pain and leg paresthesias.  There are facets of the exam which suggest embellishment of patient and facets of her examination which are non-physiological in nature suggesting functional overlay vs. malingering.  The patient is unable to lift, push, [or] pull more than 10 lbs.  The patient is unable to bend, walk, and stand for up to 5-10 minutes at a time.  The patient is able to understand the environment as well as peers and communicate satisfactorily.  The claimant is able to travel independently.

Tr. 508.

### 3.      State agency reviewing physicians

On July 12, 2007, Gerald Klyop, M.D., completed a Physical RFC Assessment.  Tr. 441-48.  He opined that Rahrig is able to occasionally lift and/or carry and push and/or pull 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and has no postural, manipulative, visual, communicative, or environmental limitations.  Tr. 442-45.  Dr. Klyop indicated that Rahrig was credible in her description of her condition and the limitations that it causes her.  Tr. 446.

On reconsideration, the state agency was of the opinion that Dr. Saghafi's actual exam findings demonstrated that a medium RFC was warranted.  Tr. 513.  However, because Dr. Saghafi indicated that Rahrig's pain allegations were out of proportion to the clinical findings but also concluded that Rahrig was limited to bending, walking and standing for 5-10 minutes at a time, the state agency requested further medical review to confirm whether a medium RFC was warranted.  Tr. 513.  On February 21, 2008, in response to the request for further review, Jeffrey Vasiloff, M.D., affirmed Dr. Klyop's July 12, 2007, assessment.  Tr. 514.

## C.      Testimonial Evidence

### 1.      Rahrig's Testimony

Rahrig was represented by counsel and testified at the administrative hearing.  Tr. 34, 35-59.  She completed high school and is able to use a computer.  Tr. 36.  She smokes about 4 cigarettes a day.  Tr. 36.   On occasion, she prepares meals.  Tr. 36-37.  Her daughter does the dishes and laundry.  Tr. 37.  She cannot vacuum an entire room but is able to push the vacuum while seated and, with a stool, she is able to get around to dust the tables.  Tr. 37.  When she goes shopping with her daughter, her daughter pushes the cart and she holds on to the cart.  Tr. 37.  She is unable to take care of her personal needs on her own.  Tr. 37.  She needs assistance with getting in and out of the shower; she has a seat in her tub which allows her to shower independently.  Tr. 37.  She also needs assistance getting dressed and sometimes cleaning herself.   Tr. 37.

Rahrig has no real hobbies.  Tr. 38.  She uses the computer and reads the newspaper but is unable to sit for long periods of time.  Tr. 38.  She does not belong to any clubs or organizations.  Tr. 38.  She visits with friends and family.  Tr. 38, 40.  She gets along with her only neighbor; he and his wife help her out.  Tr. 40.  She does not go to movies or dinner.  Tr. 38.  She indicated that she rarely interacts with her grandchildren; her son is concerned that one of them will run and jump on her.  Tr. 38.

She normally wakes up between seven and eight in the morning, takes her insulin, tries to take a shower, and eats a breakfast that her daughter has prepared for her.  Tr. 38-39.  Her daughter attends college on a part-time basis and is usually gone during the morning hours.  Tr. 39.  If she is having an o.k. day, she tries to help her daughter with cleaning.  Tr. 39.  If it is a bad day, she lies back down.  Tr. 39.  Almost every day, she takes about an hour nap.  Tr. 39.  She occasionally talks on the telephone.  Tr. 39.  During the day, she usually lies in her bed in the

fetal position.[10]  Tr. 40.  She listens to the television but cannot concentrate on watching

television.  Tr. 40.  She tries to get out during the day but does not get along well with the public.

Tr. 40.  During the day, when her daughter is with her, she tries to walk to the end of the

driveway and back.  Tr. 40.  She usually goes to sleep between eight and nine in the evening.

Tr. 40.  She is unable to sleep through the night.  Tr. 40-41.

      Rahrig's back pain became unbearable around 2008.  Tr. 56.  She has undergone two

back surgeries for disc problems.  Tr. 45-46.  She reported that, after the surgeries, her pain got

worse, not better.  Tr. 46.  Her pain starts in the middle of her back and continues down into her

left leg.  Tr. 46.  Her whole left leg goes numb at times and, as a result, she has fallen down.  Tr.

46.  She had fallen one week prior to the hearing but did not go to the doctor following the fall.

Tr. 46.  Since her diabetes has been out of control, she has been unable to obtain cortisone shots

to assist with pain management.  Tr. 50.  Rahrig reports having five or six bad days physically

each week.  Tr. 55. When she has a bad day, she usually lies in bed the entire day and, on a good

day, she has to lie down three or four times during the day for a few minutes to relieve her back

pain.  Tr. 59.

      Rahrig reported that, although it has been difficult, she has been trying to get her diabetes

under control.  Tr. 47.   She was working towards reducing the number of shots she takes each

day for her diabetes from seven to five.  Tr. 47.  She monitors her glucose levels daily and takes

her insulin regularly.  Tr. 47, 58.  Rahrig stated that her diabetes was under better control prior to

her back surgery.  Tr. 57-58.

      Rahrig indicated that, because of chest pains that were radiating into her arm, she recently

underwent a heart catheterization as a precaution.  Tr. 47-48.  Also, to help alleviate her chest

pain, in addition to the catheterization, Rahrig's doctor advised her to reduce the stress in her

---

[10] Per Rahrig, lying in the fetal position provides some relief from her back pain.  Tr. 57.

13

life.  Tr. 47.  After overdoing it, Rahrig experiences shortness of breath and trouble breathing.

Tr. 48.  She noted that she has been working on lowering her blood pressure.  Tr. 48.

Rahrig stated that she can only stand for about five minutes before feeling uncomfortable.

Tr. 50.  She can walk about a quarter-mile.  Tr. 50.  She indicated that her doctor prescribed a

cane for her to use which she was using at the hearing.  Tr. 50-51, 59.  She stated that she would

be unable to sit and perform a job for eight hours a day because she cannot sit that long.  Tr. 58.

Rahrig stated that she cannot climb stairs, bend at the waist, or kneel.  Tr. 52.  She can reach out

in front of her to pick things up but she uses a clasper to pick things off the floor or to get things

off a shelf.  Tr. 52.  She has difficulty holding on to items.  Tr. 52.  She can turn doorknobs and

open doors, use utensils and pick up and write with a pen.  Tr. 52-53.  She is unable to take the

tops off jars or bottles.  Tr. 53.

Rahrig also discussed how her depression impacts her.  Tr. 53-55.  She stated that she

does not deal well with the public; she angers easily and, when upset, she says things to others.

Tr. 53.  She feels that she still suffers from depression but does not have a counselor whom she

sees for her depression.  Tr. 54.  She noted that she takes Cymbalta but does not really see any

improvement; she still has good and bad days.  Tr. 54.  Rahrig reported having four or five bad

days emotionally each week.  Tr. 55.

Rahrig discussed the different medications that she takes throughout the day for various

issues, including Plavix for her heart;[11] Vitamin D for a Vitamin D deficiency; Novalog,

Levermir, Actos, and Metformin for her diabetes;[12] Lisinopril for her blood pressure; Nexium for

---

[11] Rahrig indicated that she had not taken her Plavix in a while because she was unable to afford it but was trying for a cheaper version.  Tr. 48-50.

[12] Rahrig noted that her doctor was trying to switch her to less expensive insulin for her diabetes.  Tr. 49.

her GERD, an aspirin, and a water pill.[13]  Tr. 48-49.   She had been taking Percocet for her pain but she reported that she was no longer being seen by Dr. Ray and therefore she was no longer taking anything for her pain.[14]  Tr. 55-56.  She reported some side effects from her medications. Tr. 49.  She gets sleepy and, if she does not eat with her medication, she gets dizzy.  Tr. 49.

### 2. Vocational Expert's Testimony

Vocational Expert Kevin Yee ("VE") testified at the hearing.  Tr. 59-66.   The VE described Rahrig's past work.  Tr. 61-62.  The car parts assembler position is classified as light and unskilled; Rahrig performed it at the medium exertion level.  Tr. 61.  The fire and water restoration position is an industrial cleaner job that is classified as heavy and unskilled.  Tr. 61. The stock/store clerk position is classified as heavy and semi-skilled.  Tr. 61.  The fast food worker position is classified as light and unskilled.  Tr. 61.  The swing shift/assistant manager position is classified as light and semi-skilled.  Tr. 61.

The ALJ asked the VE to assume a hypothetical individual of the same age, education and employment background as Rahrig who: can lift and carry, push and pull ten pounds occasionally; can stand and walk for two hours and sit for six hours, but with a sit/stand option available every hour; can occasionally climb stairs and ramps with rails; can occasionally bend, balance, stoop, and crouch; cannot kneel or crawl; can reach in all directions; can handle, finger, and feel; cannot be exposed to vibrations or hazards; is limited to performing simple routine tasks with simple short instructions and simple work related decisions with few workplace changes; should have minimal contact with the public but can interact with co-workers and supervisors.  Tr. 62.  The VE indicated that such an individual would be unable to perform Rahrig's past work.  Tr. 62.  However, the VE stated that there would be unskilled, sedentary

---

[13] Rahrig was also taking Amoxicillin for a sinus infection.  Tr. 49.

[14] Rahrig indicated that the Percocet did not help relieve her pain.  Tr. 56.

positions available in the regional or national economy for the hypothetically described individual, including address clerk (5,000 statewide; 170,000 nationwide); electronic assembler inspector (18,000 statewide; 400,000 nationwide); and telephone answering clerk (4,000 statewide; 125,000 nationwide).  Tr. 62-63.  The VE stated that, if the hypothetical individual also required the use of a cane, such a requirement would impact the three listed jobs because an accommodation by the employer would be required.  Tr. 63-64.

In response to Rahrig's counsel's questions, the VE stated that, if the restriction of minimal contact with the public was further limited to superficial contact with the public, the jobs of address clerk, electronic assembler inspector, and telephone answering clerk would remain available.  Tr. 65.  The VE also stated that, if the hypothetical individual could not be exposed to fumes, odors, and chemicals because of breathing issues, the electronic assembler inspector position would not be available.[15]  Tr. 65-66.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

---

[15] The VE indicated that an electronic assembler inspector would be exposed to fumes or odors from solvents that might be used in the manufacturing process.  Tr. 65-66.

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[16] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

---

[16] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In her May 12, 2010, decision, the ALJ made the following findings:

1.  Rahrig was insured for a period of disability and disability insurance benefits on the September 2, 2006, alleged disability onset date, and she remains insured through June 30, 2011.  Tr. 17.

2.  Rahrig has not engaged in any disqualifying substantial gainful activity since the September 2, 2006, alleged onset date.  Tr. 17.

3.  Rahrig's severe impairments since the September 2, 2006, alleged onset date are: disorders of the back, obesity, degenerative joint disease in the left hip, coronary artery disease, diabetes, obstructive sleep apnea, and depression.  Tr. 17-20.  All other impairments/problems/complaints mentioned in the record, including hypertension and left shoulder problem are not severe impairments.  Tr. 17.

4.  Since the September 2, 2006, alleged onset date, Rahrig has not had an impairment or combination of impairments that has met or medically equaled a Listing.[17]  Tr. 20.

5.  Rahrig has the residual functional capacity ("RFC") to lift and carry up to ten pounds occasionally; she can sit with normal breaks for about two hours in an eight-hour period and she can stand and/or walk with normal breaks for about two hours in an eight-hour period so long as she is afforded a sit-stand option every hour that allows her to alternate between sitting and being on her feet, at her option, to relieve pain and discomfort; she is able to handle, finger, feel and reach in all directions; she is able to occasionally climb stairs and ramps with handrails, bend, balance, stoop and crouch; she cannot kneel or crawl; she cannot be exposed to vibrations or hazardous conditions; she can perform simple, routine tasks involving no more than simple, short instructions in jobs where she would have to make no more than simple, work-related decisions in an environment where there would be few workplace changes; she can interact with co-workers and supervisors but she cannot perform work involving more than minimal contact with the public.  Tr. 21-23.

6.  Rahrig has not been able to perform any past relevant work since the September 2, 2006, alleged onset date.  Tr. 24.

---

[17] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

7.    Since the September 2, 2006, alleged onset date, Rahrig has been considered to be a younger individual.  Tr. 24.

8.    Rahrig has at least a high school education and is able to communicate in English.  Tr. 24.

9.    The presence of transferable skills is not material to the decision.  Tr. 24.

10.   Considering Rahrig's age, education, work experience and RFC, there are jobs that exist in significant numbers in the economy that Rahrig has been able to perform since the September 2, 2006, alleged onset date, including address clerk, electronics assembler/inspector, and telephone answering clerk.  Tr. 24-25.

Based on the foregoing, the ALJ determined that Rahrig had not been under a disability from September 2, 2006, the alleged onset date, through the date of the decision.  Tr.  25.

### V. Parties' Arguments

**A.    Plaintiff's Arguments**

Rahrig presents three arguments in support of her request for reversal and remand.  First, she argues that the ALJ erred in her evaluation of state consultative examining physician Dr. Dariush Saghafi's February 16, 2008, medical opinion.  Doc. 14, pp. 13-15.  Rahrig asserts that the ALJ stated that her RFC was generally consistent with the opinion of Dr. Saghafi but ignored the portion of Dr. Saghafi's opinion wherein he opined that Rahrig could bend, walk and stand for only up to 5-10 minutes at a time.  Doc. 14, p. 15.

Second, Rahrig argues that the ALJ erred in her credibility assessment.  Doc. 14, pp. 15-18.  Rahrig asserts that the ALJ did not properly analyze her complaints of pain because the ALJ did not discuss the factors set forth in Social Security Ruling 96-7p and she did not discuss portions of Rahrig's hearing testimony wherein Rahrig discussed her back pain, difficulties performing daily activities, and her need to use a cane.  Doc. 14, pp. 16-18.

Third, Rahrig argues that the VE hypothetical that the ALJ relied upon was incomplete and therefore the VE's testimony given in response to that hypothetical cannot constitute substantial evidence.  Doc. 14, pp. 18-19.  Rahrig acknowledges that the VE hypothetical limited the individual to a reduced range of sedentary work but argues that the VE hypothetical should have incorporated other limitations, including all limitations contained in Dr. Saghafi's consultative examination report and the need to use a cane.  Doc. 14, pp. 18-19.

**B.      Defendant's Arguments**

In response, the Commissioner first argues that the ALJ's consideration of the opinion evidence was proper and consistent with the regulations.  Doc. 15, pp. 12-17.  Defendant asserts that the ALJ sufficiently discussed the opinion evidence and her analysis is sufficiently clear to allow for meaningful review by this Court.  Doc. 15, pp. 13-17.  Defendant argues that, while the ALJ found the RFC to be generally consistent with Dr. Saghafi's opinion, she was not required to limit Rahrig's standing or walking to 5 or 10 minutes.  Doc. 15, p.  13.

Second, the Commissioner argues that the ALJ sufficiently discussed the evidence related to Rahrig's complaints and that the ALJ's credibility determination is supported by substantial evidence.  Doc. 15, pp. 17-19.

Third, the Commissioner argues that an ALJ is only required to include in a hypothetical question limitations supported by the record.  Doc. 15, pp. 19-20.  Further, the Commissioner argues that the VE hypothetical upon which the ALJ relied adequately accounted for Rahrig's limitations and therefore the Commissioner's decision is supported by substantial evidence. Doc. 15, pp. 19-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **The ALJ properly considered the opinion of consultative examining physician Dr. Saghafi.**

Rahrig asserts that, even though the ALJ found  consultative examining physician Dr. Saghafi's opinions to be "generally consistent" with the RFC, the ALJ did not fully adopt Dr. Saghafi's opinions, including his opinion that Rahrig "is able to bend, walk, and stand for up to 5-10 minutes at a time."  Doc. 14, p. 15; Tr. 505.  Thus, she argues that the ALJ erred in her consideration of the medical opinion evidence.  Doc. 14, pp. 13-15.

Since Dr. Saghafi, as a one-time consultative examining physician, did not have an ongoing treatment relationship with Rahrig, his opinion is not entitled to controlling weight as the opinion of a treating physician would be.[18]  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F.

---

[18] Federal regulations establish a hierarchy of medical opinion evidence, with treating physician opinions at the top. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c) (2). Opinions from treating physicians are entitled to controlling weight so long as the opinion is well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson*, 378 F.3d at 544.  Next in the hierarchy are opinions issued by examining physicians. 20 C.F.R. § 404.1527(c).  Opinions from medical professionals who have only examined the claimant on one occasion are not automatically entitled to any

Appx. 496, 507 (6th Cir. 2006); *Daniels v. Comm'r of Soc. Sec.*, 152 F. Appx. 485, 490 (6th Cir.

2005).  Although not entitled to controlling weight, when an ALJ evaluates a medical opinion

such as that of consultative examining physician Dr. Saghafi, she is to consider relevant factors

such as the examining relationship, treatment relationship, length of relationship and frequency

of the examination, nature and extent of the treatment relationship, supportability of the opinion,

consistency of the opinion with the record as a whole, specialization, and other factors. 20 C.F.R.

§ 404.1527(c).  However, the ALJ is not obliged to explain the weight afforded to each and every

factor that might pertain to the medical source opinions. *See Francis v. Comm'r of Soc. Sec.*, 414

F. Appx. 802, 804 (6th Cir.2011) (indicating that, when assessing the weight to be assigned to a

medical opinion, an exhaustive factor-by-factor analysis is not required).  Further, "[a]n ALJ

does not improperly assume the role of a medical expert by assessing the medical and non-

medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of

Soc. Sec.*, 342 F. Appx. 149, 157 (6th Cir. 2009).  Here, the ALJ assessed Dr. Saghafi's opinion

in accordance with the Regulations when she established Rahrig's RFC.

     Rahrig takes issue with the fact that the ALJ did not incorporate in her RFC assessment

the portion of Dr. Saghafi's opinion that concluded that Rahrig "is able to bend, walk, and stand

for up to 5-10 minutes at a time," although the ALJ did conclude that Dr. Saghafi's opinion was

"generally consistent" with the RFC.  Doc. 14, p. 15; Tr. 505.   When the ALJ concluded that the

RFC was "generally consistent" with Dr. Saghafi's opinion, the ALJ specifically cited to p. 4 of

Exhibit No. 22F, which contains Dr. Saghafi's opinion.  Tr. 23, n.30.  Thus, it is clear that the

ALJ did not ignore Dr. Saghafi's opinion.  Tr. 23.  "[A]n ALJ's failure to cite specific evidence

---

special degree of deference.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994).  Finally, an adjudicator must
consider the findings of non-examining physicians. 20 C.F.R. § 404.1527(e).  Opinions from non-examining
physicians are also not entitled to any special degree of deference.  *Id.*

does not indicate that it was not considered." *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, * 489 (6th Cir. 2005). Thus, the fact that the ALJ did not specifically identify each part of Dr. Saghafi's opinion does not mean that she did not consider each part.

The RFC provides for standing and/or walking with normal breaks for about 2 hours in an 8-hour workday, a sit/stand option every hour, and limits Rahrig to occasional bending. Tr. 21. In addition to the portion of Dr. Saghafi's opinion upon which Rahrig relies, Dr. Saghafi also opined that there were "facets of the exam which suggest embellishment of patient . . . suggesting functional overlay v. malingering." Tr. 505. While the ALJ's RFC is not an exact replica of Dr. Saghafi's opinion, the RFC limitations are "generally consistent" with Dr. Saghafi's opinion. Tr. 505. Since Dr. Saghafi's opinion is not entitled to controlling weight, it cannot be said that, because the ALJ noted that the RFC was "generally consistent" with Dr. Saghafi's opinion, the ALJ's failure to incorporate every limitation noted by Dr. Saghafi constitutes error. *See Earls v. Comm'r of Soc. Sec.*, 2011 WL 3652435, * 5 (N.D. Ohio Aug. 19, 2011) (indicating that, even where an ALJ affords considerable and substantial weight to a medical opinion, there is no rule requiring an ALJ to incorporate verbatim into the RFC every finding contained in that opinion).

Finally, although the ALJ did not provide a detailed analysis of each factor outlined in 20 C.F.R. § 404.1527(c), it is clear that she gave more weight, but not controlling weight, to Dr. Saghafi's opinions than those of the state agency reviewing physicians.[19] Tr. 23. The ALJ discussed and considered the medical opinions and provided a detailed analysis of how she reached her RFC determination. Tr. 21-23. For example, the ALJ noted that, notwithstanding Rahrig's need to undergo two back surgeries because of disc problems, there is a lack of

---

[19] The state agency reviewing physicians' RFC reflects medium exertion level (Tr. 441-48, 514) and is therefore less limiting than either the ALJ's established RFC or Dr. Saghafi's opinion (Tr. 21, 505).

significant and ongoing objective findings to support a more limiting RFC.  Tr. 22-23.  Here, the

lack of detailed factor-by-factor analysis of the factors under 20 C.F.R. § 404.1527 or a specific

statement as to the weight assigned to Dr. Saghafi's opinion is not a basis for reversal.  *See*

*Francis*, 414 Fed. Appx. at 804.

For the reasons set forth above, Rahrig has failed to demonstrate that the ALJ erred in her

consideration of and assessment of the medical opinions.  Therefore, Plaintiff's request for

reversal is without merit.

**B.      The ALJ properly assessed Rahrig's credibility.**

Rahrig claims that the ALJ failed to provide sufficient analysis of her assessment of

Rahrig's credibility.  Doc. 14, pp. 14-18.  In support of her argument, Rahrig claims that the ALJ

failed to consider certain evidence, such as Rahrig's use of a cane, and also failed to adequately

address the credibility factors set forth in Social Security Ruling 96-7p.  Doc. 14, pp. 14-18.

Where the symptoms, and not the underlying condition, form the basis of the disability

claim, the ALJ uses a two-part analysis in assessing the credibility of an individual's subjective

statements about his or his symptoms.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th

Cir. 2007) (citing 20 C.F.R. § 416.929).  First, the ALJ must determine whether the claimant has

an underlying medically determinable impairment that could reasonably be expected to produce

the claimant's symptoms.  *Id.*  Second, if such an impairment exists, then the ALJ must evaluate

the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.

*Id.*  The ALJ should consider the following factors in evaluating a claimant's symptoms:

> 1)  the individual's daily activities;
> 2)  the location, duration, frequency, and intensity of the individual's pain or other
>     symptoms;
> 3)  factors that precipitate and aggravate the symptoms;
> 4)  the type, dosage, effectiveness, and side effects of any medication the individual takes
>     or has taken to alleviate pain or other symptoms;

5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) ; Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  An ALJ's credibility assessment must be supported by substantial evidence but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state her reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); SSR 96-7p, 1996 WL 374186, *2.

Here, the ALJ determined that Rahrig's impairments could reasonably be expected to cause pain, fatigue, depression, and numbness in her lower extremities and that Rahrig's impairments could reasonably be expected to interfere with standing, walking, sitting, lifting, climbing, kneeling, crawling, bending, balancing, stooping, crouching, concentrating, and

working with others.  Tr. 22.  However, the ALJ did not find credible Rahrig's allegations that her impairments would cause limitations beyond those limitations identified in the RFC.  Tr. 22.

In support of her argument that the ALJ erred in her credibility analysis, Rahrig claims that the ALJ did not consider the fact that she requires use of a cane or that she experiences extreme pain radiating into her leg.  Doc. 14, p. 17.  However, the ALJ did acknowledge some pain related restrictions on motion in Rahrig's lumbar spine and some reflex loss but also considered that the evidence, since the alleged onset date, does not document significant motor loss, muscle weakness, muscle atrophy or sensory deficits in Rahrig's lower extremities.  Tr. 20, 22-23.  In support of her conclusions, among other reports, the ALJ referred to Dr. Saghafi's report which shows that Rahrig's muscle tone and bulk were normal and her motor examination was normal.  Tr. 20, 506.  Additionally, with respect to Rahrig's claim that she needs to use a cane, the ALJ specifically noted that there is a lack of evidence that any medical source had indicated that Rahrig has needed to use an assistive device for any continuous 12-month period since the alleged onset date.  Tr. 20.  Moreover, in 2007, before her back surgeries, Rahrig completed two function reports wherein she did not report the use of a cane. Tr. 147, 166.  Also, following her back surgeries, on September 9, 2008, Rahrig's physician, Dr. Hazen, recommended that Rahrig start getting along without a brace six weeks post-operatively.  Tr. 673.

Additionally, Rahrig argues that the ALJ did not properly address the factors set forth in SSR 96-7p.  However, in reaching her credibility determination, the ALJ considered the entire record, including evidence relating to Rahrig's daily activities which the ALJ concluded was incompatible with her allegations of disabling symptoms.  Tr. 23.  For example, a 2008 treatment record reflects that Rahrig told her physician that she was taking care of a young

grandson on a daily basis. Tr. 23, n. 29 (citing Tr. 471, 525, 557). Also, Rahrig reported being capable of performing household chores (with some assistance in doing the laundry) and shopping. Tr. 23, n. 29 (citing Tr. 141-48; 160-167). Moreover, when assessing Rahrig's credibility, the ALJ noted that there are no significant side-effects mentioned in Rahrig's medical records to substantiate the alleged severity of her limitations. Tr. 23.

As acknowledged by Rahrig, a factor-by-factor analysis of each of the factors under SSR 96-7p, is not required. Doc. 14, p. 17; *See, e.g., Cross v. Comm'r of Soc. Sec.,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) (finding that the ALJ need not analyze all seven factors identified in the regulations in assessing a claimant's credibility). The ALJ conducted a thorough analysis of the evidence, including the lack of evidence demonstrating the need for a cane, Rahrig's daily activities, medication side effects, and objective medical findings and the ALJ provided a number of reasons for discounting Rahrig's credibility. The ALJ credited Rahrig with limitations resulting from her medically determinable impairments but also found, based on substantial evidence in the record, that the limiting effects of those impairments were not as severe as Rahrig alleged and did not preclude all work. The ALJ reasonably concluded that Rahrig was not fully credible in alleging that she was incapable of performing any sustained work activity and the ALJ's decision is supported by substantial evidence. The ALJ's credibility determination is therefore entitled to deference and Plaintiff's request for reversal is without merit.

**C.      The ALJ presented a proper hypothetical to the VE and, therefore, her decision, which is based in part on the VE's testimony, is supported by substantial evidence.**

Rahrig argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not specifically include in the RFC and in the VE hypothetical all of the limitations noted in consultative examining physician Dr. Saghafi's opinion or the use of a cane.

27

Doc. 14, pp. 18-19.  Rahrig's third argument is a variation and/or combination of her first two arguments, which are without merit.  As discussed above, the ALJ properly considered the opinion of Dr. Saghafi.  While the RFC is not an exact replica of Dr. Saghafi's opinion, the RFC is "generally consistent" with that opinion.  Further, as discussed above, there was no medical source opinion to support Rahrig's claim that she required the use of a cane or assistive device for any continuous 12-month period.  Because Rahrig's third argument rests upon arguments that have been determined to be without merit, Rahrig's third argument also lacks merit.

Moreover, Rahrig's third argument lacks merit because "[h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  Additionally, the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a); 416.927(a); 404.1546(c); 416.946(c), *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  Here, the ALJ's RFC is supported by substantial evidence.  The ALJ reasonably concluded that Rahrig's subjective complaints were not as limiting as she alleged and the VE hypothetical upon which the ALJ relied reasonably accounted for her limitations, including adequate standing and walking restrictions.  Thus, the ALJ's reliance on the VE's testimony was proper and constitutes substantial evidence and Plaintiff's request for reversal is without merit.

## VII. Conclusion

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.


Dated:  August 1, 2013

_____
Kathleen B. Burke
United States Magistrate Judge